17033

CHILEAN NITRATE SALES CORPORATION, Respondent, v.
SOUTHERN RAILWAY-CAROLINA DIVISION, Appellant
(88 S. E. (2d) 242)

*Messrs. Frank G. Tompkins, Jr.,* of Columbia, *Charles M. Little,* of Washington, D. C., and *Barnwell & Whaley,* of Charleston, *for Appellant,*

*Messrs. Sinkler, Gibbs & Simons,* of Charleston, *for Respondent,*

July 18, 1955.

TAYLOR, Justice.

Respondent here seeks to recover the value of 1,800 bags of nitrate of soda lost by fire after they had been loaded in three of appellant's cars on December 20, 1950. By consent the matter was heard by the presiding Judge of the Court of Common Pleas for Charleston County at the November Term, 1953, without a jury. After hearing testimony from both sides, the presiding Judge overruled respondent's and appellant's motions for directed verdicts and took the matter under advisement. Thereafter, by his decree dated April 26, 1954, he rendered judgment for plaintiff-respondent in the sum of $4,635.00 with interest and costs and this appeal presents the questions of, first, whether or not the delivery of the nitrate of soda to the carrier was completed at the time of its destruction; and, second, is carrier estopped to deny delivery of the nitrate of soda after having executed an unconditional bill of lading and, if not, can the carrier introduce evidence of long standing custom, usage, or practice relative to the matter in question.

Respondent is a New York corporation operating in Charleston County, South Carolina, by and through its agent Etiwan Fertilizer Co., a South Carolina corporation. The respondent corporation imports nitrate of soda in bulk which is unloaded from ships at the Etiwan dock in Charleston County where it is bagged by Etiwan and shipped in boxcars according to its orders over three railroads serving the Etiwan plant.

The facts in this case are substantially undisputed. On the date in question, Etiwan loaded three of appellant's cars with 600 bags each of nitrate of soda destined for various points in South Carolina. The loading was completed, the doors sealed, and cars placarded as required by the Interstate Commerce Commission on cargo of this type. The appellant railroad signed bills of lading for the three cars at 1:45 p. m. on the date of the fire at their office in the City of Charleston when they were presented by an employee of Etiwan. These bills of lading each bore the following certification as required by the Interstate Commerce Commission:

"This is to certify that the above articles are properly described by name, and are packed and marked, and are in proper condition for transportation, according to the regulations prescribed by the Interstate Commerce Commission. Dangerous Placard Applied."

Such certification was placed thereon by the use of a rubber stamp and then signed by the general manager of respondent.

At approximately 2:55 p. m., fire was discovered in the warehouse which ultimately consumed the three cars in question and their contents. Respondent took the position at the hearing, and the trial Judge found that there had been an actual and complete delivery of this 1,800 bags of nitrate of soda "in proper condition for transportation," and that there was nothing further to be done by the shipper.

Respondent's place of business, from which the loading operations in question were conducted, was served by three parallel tracks, the first, or No. 1 track, being adjacent to the shed, close enough to the platform for the intervening space between the cars and the platform to be bridged by a steel "gang board" or "gang way." The next, or No. 2 track, was constructed parallel to No. 1 or in such proximity that when the cars were spotted in such manner that the doors were opposite the cars previously spotted on No. 1 track, that the intervening space between the cars on No. 1 track and No. 2 track could be bridged by the placing of similar "gang boards" or "gang ways" and the third track was constructed in the same relationship to the second track as the second was to the first. The testimony reveals that the placing of the cars to be loaded was controlled by Etiwan through what is known as its switch list of the previous day. Over a period of more than ten years the manner of doing business between appellant and respondent was that respondent would prepare its switch list and leave it in a designated box in the yard where it was picked up by the crew of the Southern Railroad at approximately 4:30 every afternoon and pursuant to this switch list such cars, as directed, were removed from the tracks and such empties, as directed, placed in position for loading the next day. These tracks had a capacity of approximately thirty cars and on the day in question was occupied by twenty-three cars. These cars were loaded by hand trucks with the gang boards being placed by respondent between the platform and the cars on No. 1 track and between the cars on No. 2 track and No. 3 track so that the appellant's cars for all intents and purposes were used as a platform or way to load the outlying cars. The cars on No. 3 track, furtherest away from the loading shed, were always loaded first with the cars nearest the loading shed being the last to be loaded, closed, and sealed. One of the cars in question was the No. 2 car from the head end on No. 3 track, another was No. 5 car from the end on No. 1 track, and the other was car

No. 8 from the end on No. 1 track. Three railroads served respondent's business, the Southern Railway—Carolina Division, the appellant here; the Seaboard Airline Railroad and the Atlantic Coast Line Railroad, with the Southern being the first of the three to conduct the necessary shifting operations which commence at 4:30 p. m. each afternoon, in order not to interrupt Etiwan's loading operations. The loadings of Etiwan were conducted in accordance with orders in duplicate issued from the office to those charged with loading the cars. The person in charge of loading would place the copy of such orders in the. car and proceed to load accordingly. He would place the number of the car on the original and return it to the office where the bills of lading would be made up in the morning to cover cars to be loaded during the day. At the time of the making up of these bills of lading some of the cars would be completely loaded, some would be partially loaded, and some completely empty. These bills of lading would be delivered to the carrier's office in the City of Charleston in the late morning or early afternoon of each day. On occasions a car would be held until the next day even though the bill of lading had already been made up and on occasions such bills of lading were changed and new car numbers assigned. In fact, one of the bills of lading in the instant case was so changed prior to its being carried to appellant's office in Charleston. The switching crew who handled the removing and placing of cars never saw the bills of lading but were controlled entirely by the switch list which was prepared by respondent at the place of business.

The switch list bore the date and destination of such cars as were destined for removal and a list of the empty cars to be spotted. The entire operation was controlled by respondent through the switch list and no car was moved whether loaded or empty except when directed by Etiwan through the switch list.

At the time of the fire, as heretofore stated, respondent had completed the loading of the three cars in question but

the "gang way" was still in place between the platform and car No. 1 on track No. 1 so as to prevent the railroad from pulling the string of ten cars on track No. 1 which was nearest the warehouse and contained two of the cars in question.

There is no evidence of a switch list having been prepared on the day in question, but one witness testified that if it had been prepared, it had been lost in the fire. Certainly, none was ever placed in the box to be picked up by appellant's crew, and since this was the means used to transmit instructions to appellant, no instructions as to removal of cars was transmitted to appellant on this date.

In order to charge appellant with the liability of a common carrier, it was incumbent upon respondent to establish, first, that there had been a complete delivery of the goods to the carrier, actual or constructive; second, that the delivery was made for the purpose of shipment, with full shipping directions; third, that the goods had been accepted by the carrier for immediate shipment, or at such time as the convenience of the carrier may suggest; fourth, that the goods had gone into exclusive possession of the carrier, and that nothing further was to be done with or to them by the owner.

The decree of the trial court is based largely upon the premise that there was nothing further to be done by the shipper, that delivery was an accomplished fact and that the carrier in receipting therefor through the signing of the prepared bill of lading had accepted delivery. The issuance of the bill of lading raises the presumption that the goods were delivered to the carrier for shipment; however, this presumption is a rebuttable one. See 13 C. J. S., Carriers, § 127, wherein it is stated:

"Between the consignor of goods and a receiving carrier, recitals in a bill of lading as to the goods shipped raise only a rebuttable presumption that such goods were delivered for shipment. As between the consignor and the receiving carrier the fact must outweigh the recitals."

The foregoing is not in conflict with the holding of this court in *Thomas v. Atlantic Coast Line R. Co.,* 85 S. C. 537, 64 S. E. 220, 221, 67 S. E. 908, 34 L. R. A., N. S., 1177, wherein the following language was used:

"A bill of lading is regarded as having a twofold character—as a receipt for goods delivered, and as a contract for their shipment. In so far as it may be treated as a mere receipt it is generally held that as between the original parties it is not conclusive, but it is only *prima facie* evidence of the truth of its recital, and may be varied or contradicted by parol," and

In *Palmetto Fertilizer Co. v. Columbia, N. & L. R.,* 99 S. C. 187, 83 S. E. 36, 38, this court citing *Reid Phosphate Co. v. Farmers' Fertilizer Co.,* 94 S. C. 212, 77 S. E. 863, acknowledged the same principle stating:

"As between the consignor and a receiving carrier, the fact must outweigh the recital. The consignor cannot conclusively prevail against the receiving carrier for 500 sacks simply because the bill of lading recited 500 sacks. The bill of lading raises, in the consignor's favor, the presumption that the car did have 500 sacks; but the carrier may show the truth against the writing and against the presumption."

A bill of lading therefore is not conclusive but *prima facie* evidence, only, between the original parties that the goods actually came into the carrier's custody and as such is open to explanation, modification, or contradiction as are other types of receipts. See Elliott on Railroads, 3rd edition, Section 2139, and *Missouri Pacific R. Co. v. McFadden,* 154 U. S. 155, 14 S. Ct. 990, 991, 38 L. Ed. 944, wherein it is stated that:

"While the authorities may differ upon the point of what constitutes delivery to a carrier, the rule is nowhere questioned that when delivery has not been made to the carrier, but, on the contrary, the evidence shows that the goods remained in the possession of the shipper or his agent after the signing and passing of the bill of lading, the carrier is not liable as carrier under the bill."

In the instant case (a) the cars were units of a larger group so placed upon instructions of the shipper; (b) they were upon tracks owned and controlled by the shipper; (c) they were so placed to facilitate their loading, the near cars being used as a way to the further cars; (d) the gang ways were placed and removed by the shipper at will and as it suited its needs; (e) the gang way was still in place in No. 1 car on No. 1 track, indicating it was not ready for shipment and rendered it impossible for appellant to pull that string of cars; (f) the switching time was 4:30 p.m. except on occasions when the shipper directed otherwise and no such directions had been made on the date in question; (g) the cars remained under the control of the shipper until it issued its "switch list" and placed it in the box for the train crew to pick up; (h) only after receipt of the switch list did the carrier assume control of the cars on the shipper's tracks; (i) there is no evidence of a "switch list" being prepared for the day in question, the fire having occurred approximately at 2:50 p. m.

We are not impressed by respondent's position relative to the significance of the stamped notation on the bill of lading in that it constitutes notice to the carrier that the goods are ready for transportation. This stamp was in compliance with a regulation of the Interstate Commerce Commission relative to the transportation of explosives and other dangerous commodities under Supplement 18, Section 421 of the Interstate Commerce Commission Tariff rather than notice to the carrier of its delivery at that time.

For the foregoing reasons we are of the opinion that a full and complete delivery of the goods in question had not been accomplished at the time of the fire, that they were still under control of the shipper, and that there was no error in permitting appellant to offer testimony to this effect in order to rebut the presumption that delivery had been had upon the issuance of the bill of lading, that the Order appealed from should be set aside, the case remanded to the Court of Common Pleas for Charleston County for the pur-

pose of entering judgment for appellant; and it is so ordered.

Reversed.

BAKER, C. J., and STUKES, OXNER and LEGGE, JJ., concur.